IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JAMES B. O'LAUGHLIN, | : | |
| Plaintiff, | : | Case No. 3:14cv00191 |
| vs. | : | District Judge Walter Herbert Rice |
| CAROLYN W. COLVIN, Commissioner of the Social Security Administration, | : | Chief Magistrate Judge Sharon L. Ovington |
| | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

**I.     Introduction**

Plaintiff James B. O'Laughlin brings this case challenging the Social Security Administration's denial of his applications for Disability Insurance Benefits and Supplemental Security Income.  He contends that Administrative Law Judge Mary F. Withum – who denied his applications – made multiple errors that led to her to incorrectly find that he was not under a "disability" and therefore not eligible for benefits.

The case is presently before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #14), Plaintiff's Reply (Doc. #15), the administrative record (Doc. #6), and the record as a whole.

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks an Order reversing the Administrative Law Judge's nondisability decision and remanding this matter to the Social Security Administration for payment of benefits. The Commissioner seeks an Order affirming the denial of Plaintiff's applications.

## II.     Plaintiff's Background

Plaintiff asserts here, as he did before the Social Security Administration, that he is under a benefit-qualifying disability in part due to severe pain, particularly cervical and shoulder pain from a broken neck and fusion surgery; traumatic brain injury; hernia and surgical removal of muscle from his right abdomen; and bowel incontinence. Plaintiff maintains that these and other health problems caused him to be unable to perform substantial paid work starting on February 11, 2005.

Plaintiff was 29 years old on the date his alleged disability began, placing him in the category of a "younger person" for purposes of resolving his applications for benefits. *See* 20 C.F.R. §§ 404.1563(c); 416.963(c).[2] He has a high-school education. A vocational expert testified during an administrative hearing that Plaintiff's past relevant employment involved work as a "setter."[3] (Doc. #6, *PageID*# 116).

Plaintiff was seriously injured in a motor vehicle accident in early 2005. (*PageID*#

---

[2] The remaining citations will identify the pertinent DIB Regulations with full knowledge of the corresponding SSI Regulations.

[3] The vocational expert meant "machine setter" or "machinist, as seen in his citation to the Dictionary of Occupational Titles, 600.360-014. A machinist sets up and adjusts machine tools such as lathes, milling machines, or drills and punch presses. *Id*.

367). Plaintiff informed Dr. Vitols, a consulting examiner, that he suffered a fracture of the cervical spine, punctured liver and abdominal injuries that required a splenectomy. He has undergone a cervical fusion. (Doc. #6, *PageID#* 630). He also told Dr. Vitols "that he was paralyzed on the left side and that he could not walk. He was transferred to Drake Center in Cincinnati where he underwent extensive rehabilitation ...." (*PageID##* 630-31). And Dr. Vitols noted that Plaintiff "reports he apparently suffered breakage of the screw and plate fixation of the cervical spine and reports that this was redone and estimates in approximately 2009." (*PageID#* 631).

During an administrative hearing in February 2003, Plaintiff testified that pain medication prescribed by Dr. Allen helped to relieve his shoulder and upper-neck pain. Unfortunately, his insurance would not continue to pay for that particular medication. At the time of the hearing, he was taking Percoset, which helps ease his pain but does not make him pain free and it causes constipation.

Plaintiff testified that he has 2 herniated discs in his lumbar spine (L4 and L5). Injections helped alleviate his low-back pain for 3 to 4 weeks, but a physician told him that he could only get an injection every 3 months. His pain is sharp "like a pulsating, stinging." (*PageID#* 99). On a good day when he takes medications, his pain level is about 4 or 5 on a 1–10 pain scale (1 = light pain; 10 = emergency-room pain). Without pain medication, his pain is usually 8 or 9, and it has reached the level of 10. He has about an equal number of good days as bad each week. Plaintiff takes medication for muscle spasms, but it makes him sick to his stomach.

Plaintiff explained that he also experiences bowel incontinence that is uncontrollable at times. He noted, "when it comes, I got to get up and go.... [I]t doesn't give me any warning." (*PageID#* 101). This occurred about 3 to 4 times per month and had happened since he began his home recovery in 2006, after his motor vehicle accident.

As to his daily activities, Plaintiff's son usually wakes him up in the morning. He makes his son something to eat, then lies down on the couch and watches his son watch cartoons on TV. Depending on how much Plaintiff is hurting, he will get up and shower around noon or 1:00 p.m. He usually accompanies his wife when she picks up his step-daughter after school. Plaintiff added, "And that's about the consistency of it. Me on the couch...." (*PageID#* 103). He does the dishes and laundry but he cannot carry laundry down steps. He cannot do laundry without his wife's help because he cannot get up and down the steps frequently enough. (*PageID#* 109). He sleeps "very uncomfortably" – about 4 or 5 hours per night, at most. (*PageID#* 103). Sometimes he naps during the day – sometimes 4 or 5 times; sometime no nap at all.

Plaintiff can walk about ½ block, then needs to take a break. He can stand for 10 or 15 minutes, then must sit down. He can alternate between sitting and standing if he remains in one location. If Plaintiff sits in a reclined position, he can sit for 1 or 2 hours. If he is not reclining, he can sit for 15 minutes at most before he starts hurting in his "buttocks area." (*PageID#* 106). He can kneel but is limited in his ability to stoop or crouch because of low-back pain. He has lacked balance ever since his motor vehicle accident. He uses the wall and counter tops when he walks in his house. He needs to use

the hand rails to walk down the stairs in his house.

Plaintiff has shoulder pain that does not prevent him from raising his arms in front of him but limits his arm raising to the side. He estimated that he can lift about 10 to 15 pounds.

In 2012, not long before the administrative hearing, Plaintiff underwent surgery to remove a "bulk mass" in his abdomen. Physicians were concerned it might be cancerous (it wasn't) so they removed part of his right oblique muscle. He testified that because of this surgery, he had problems trying to sit up or move in certain positions.

## III. Medical Source Opinions

At the request of the Ohio Bureau of Disability Determinations, Dr. Vitols examined Plaintiff in October 2011. Plaintiff reported to Dr. Vitols that he was "independent with ADLs [activities of daily living]. He participates in household activities and chores. He does not utilize any assistive devices for ambulation and does drive. On an average day, he estimates that he can walk up to two to three city blocks. On a flare up day or bad day, he reports he can barely leave the house." (*PageID#* 631). After examining Plaintiff, and considering his "clinical objective findings," Dr. Vitols opined that Plaintiff's "functional capacity level is in the light capacity level." (*PageID#* 636). Dr. Vitols explained, "He lost significant cervical motion and would have difficulty performing activities that require cervical motion with associated muscle weakness of the left arm, which adversely affects his ability to carry on work related activities on a sustained level. [Plaintiff's] right sacroiliitis likewise affects his ability to bend and twist at

5

the waist on an ongoing basis...." (*PageID#* 636).

Plaintiff's treating physician Dr. Allen completed a form titled, "Functional Capacity Evaluation," in May 2012.  He checked boxes indicating that Plaintiff had significantly reduced range of motion, spinal deformity, impaired sleep, tenderness, muscle spasm, muscle atrophy, and muscle weakness.  Another checkmark indicated Plaintiff was in "Severe Pain (would preclude the activity precipitating the pain.)." (*PageID#* 767).  Dr. Allen opined that Plaintiff could continuously sit for 2 hours, continuously stand for 2 hours, and continuously walk for 2 hours. (*PageID#* 768).  Dr. Allen further believed that during an 8-hour workday, Plaintiff needed to walk 60 minutes a day, 5 minutes at a time. Dr. Allen checked additional boxes indicating that Plaintiff needed a job that permits him to shift position from sitting, standing, and walking; could stand and walk, each less than a total of 2 hours during an 8-hour workday; and could sit about less than 2 hours during an 8-hour workday.  According to Dr. Allen, Plaintiff could occasionally lift and carry up to 20 pounds in a competitive work situation, and he could not bend, squat, crawl, climb, stoop, crouch, or kneel.  He could occasionally reach for things.  Dr. Allen anticipated that Plaintiff's impairments or treatment would cause him to be absent from work, on average, 3 or more times per month.  Significantly, Dr. Allen believed that the earliest date Plaintiff's limitations – i.e., those Dr. Allen identified – applied was January 18, 2012. (*PageID#* 771)

The administrative record contains over 1100 pages, most of which are Plaintiff's medical records.  A detailed description of these records is unnecessary because the

undersigned has reviewed the entire administrative record and because both the ALJ and Plaintiff's repeatedly discuss the relevant records.  The Commissioner defers to the ALJ's decision and otherwise discusses the relevant medical evidence in the course of her arguments.

## IV.     "Disability" Defined and ALJ Withum's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income a claimant must be under a "disability" as the term is defined in the Social Security Act.  *See* 42 U.S.C. §§423(a), (d), 1382c(a).  The definition of the term "disability" is essentially the same for both benefit programs.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

As noted previously, it fell to ALJ Withum to evaluate the evidence connected to Plaintiff's benefit applications.  She did so by considering each of the 5 sequential steps set forth in the Social Security regulations.  *See* 20 C.F.R. § 404.1520(a)(4).  Although she reached significant conclusions at each sequential step, her more pertinent findings occurred at Steps 2, 3, and 4.

At step 2, ALJ Withum found that Plaintiff has the severe impairments of degenerative disc disease in the lumbar spine and cervical spine, left shoulder arthritis, and

depression. She further found that Plaintiff had non-severe impairments including "shaken baby syndrome," hypertension, broken neck, broken collarbone, neuropathy, headaches, bowel incontinence, hip arthralgia, and hernia. (Doc. #6, *PageID# 62*).

At step 3, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments.[4] (*PageID# 63*).

At step 4, the ALJ concluded that the most Plaintiff could do in the workplace despite his impairments – his so-called "residual functional capacity," 20 C.F.R. §404.1545(a) – consisted of the following:

> [He] has the residual functional capacity to perform sedentary work ... except that [he] must be allowed to alternate between sitting and standing at will provided that he is not off task more than 5% of the work period. [He] can never climb ladders, ropes, or scaffolds and must avoid all exposure to unprotected heights. [He] can only occasionally climb ramps or stairs, stoop, crouch, kneel, but no crawling. [He] can only push or pull with his left arm and can only frequently bilaterally reach on the side. [He] can never reach overhead bilaterally. [He] cannot repetitively rotate, flex, or extend his neck. [He] is capable of understanding and carrying out multiple instructions and can only occasionally interact with co-workers and supervisors.

(*PageID# 65*). The ALJ found that in light of these maximum workplace abilities, Plaintiff could no longer work as a machinist. Further, at step 4, the ALJ recognized, "There is no evidence in the record for treatment from 2005 through 2009." (*PageID# 66*).

Still, there were other existing jobs he could do – polishing machine operator,

---

[4] The Listings appear in the Regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1.

sorting machine operator, and rotor assembler. He was therefore not under a disability, according to ALJ Withum.

## V. Judicial Review

The Social Security Administration's denial of Plaintiff's applications for benefits – here, embodied in ALJ Withum's decision – is subject to judicial review along two lines: whether the ALJ applied the correct legal standards and whether substantial evidence supports the ALJ's findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Social. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when "a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

## VI. Discussion

9

### A. <u>Medical Source Opinions</u>

Plaintiff argues that the ALJ failed to properly apply the treating physician rule when evaluating the opinion of his treating physician, Dr. Allen. Plaintiff reasons that Dr. Allen's opinion was based on medical evidence that Dr. Vitols did not have when he evaluated Plaintiff. He further reasons that the ALJ should have credited Dr. Allen's opinions because he based them on objective test, MRIs, and pain management procedures.

Social security regulations recognize several different types of medical sources: treating physicians, nontreating yet examining physicians, and nontreating/record-reviewing physicians. *Gayheart v. Comm'r Social Sec.*, 710 F.3d 365, 375 (6th Cir. 2013).

> As a general matter, an opinion from a medical source who has examined a claimant is given more weight than that from a source who has not performed an examination (a "nonexamining source"), and an opinion from a medical source who regularly treats the claimant (a "treating source") is afforded more weight than that from a source who has examined the claimant but does not have an ongoing treatment relationship (a "nontreating source"). In other words, "[t]he regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker." Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996).

*Gayheart*, 710 F.3d at 375 (citing, in part, 20 C.F.R. §§ 404.1527(c)(1) and (2) (eff. April 1, 2012)).[5] To effect this hierarchy, the Regulations adopt the treating physician rule. *See Gayheart*, 710 F.3d at 375; *see also Rogers*, 486 F.3d at 242; *cf. Bauer v. Astrue*, 532 F.3d

---

[5] The Social Security Administration has re-lettered 20 C.F.R. §404.1527 without altering the treating physician rule or other legal standards. *See Gentry*, 741 F.3d at 723. The re-lettered version applies to decisions, like ALJ Withum's decision, issued on or after April 1, 2012.

606, 608 (7th Cir. 2008) ("in fact the technical name for the 'treating physician' rule is the 'treating source' rule"). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with other substantial evidence in [a claimant's] case record."

*Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. §404.1527(c)(2)); *see Gentry*, 741 F.3d at 723. If both conditions do not exist, the ALJ's review must continue:

> When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors.

*Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

As to non-treating medical sources, the regulations require ALJs to weigh their opinions "based on the examining relationship, (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §404.1527(c)).

In the present case, the ALJ's evaluation of Dr. Allen's opinions applied the correct legal standards, and substantial evidence supports the ALJ's decision to place little to no weight on Dr. Allen's opinion. The ALJ acknowledged that Dr. Allen was a treating source under 20 C.F.R. § 404.1527(c)(2). Despite this treating relationship with Plaintiff, however, the ALJ concluded that Dr. Allen's highly restrictive opinions were not

11

consistent with the evidence in the record, including his own treatment notes. (*PageID* #70). Substantial evidence supports this reason for discounting Dr. Allen's opinions. For example, in January 2012, Dr. Allen noted that Plaintiff only needed pain management since he had no acute complications. (*PageID*## 70, 685-86). In July 2012, only one month after completing the May 2012 functional capacity evaluation, Dr. Allen noted that Plaintiff's shoulder injections worked well for Plaintiff, and he had normal range of motion in his neck. (*PageID*## 70, 959). Thus, the ALJ reasonably found that Dr. Allen's own treatment notes showing a favorable response to treatment contradicted his very restrictive May 2012 functional assessment. (*PageID*# 70); *cf. Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir.1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). In addition, Dr. Allen repeatedly referred to Plaintiff's "chart" without providing any meaningful explanation in support of his opinions. (*PageID*## 765-71). Given this, the "supportability" factor did not favor crediting Dr. Allen's opinions. The regulations explain, "The better an explanation a source provides for an opinion, the more weight we will give that opinion...." 20 C.F.R. §404.1527(c)(3); *see White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("[C]onclusory statements from physicians are properly discounted by ALJs.").

     Further, Dr. Allen's findings were inconsistent with other evidence in the record, such as the contemporaneous May 2012 examination by orthopedist Dr. James

12

Decaestecker, who found that Plaintiff had normal range of motion, no edema, and no tenderness. (*PageID##* 70, 1039). Given this, Dr. Allen's opinions were not due controlling weight under the treating physician rule, and the "consistency" factor weighed against fully crediting Dr. Allen's opinions. *See* 20 C.F.R. §§ 404.1527(c)(2)-(3). The ALJ properly considered that, unlike Dr. Decaestecker, Dr. Allen is a general practitioner, not an orthopedic specialist. (*PageID##* 70, 681-763). Additionally, some of Dr. Allen's findings had no basis, such as a limitation to driving only occasionally, which contradicted Plaintiff's testimony that he drove often. (*PageID##* 70, 93, 770). The ALJ also properly considered that Dr. Allen had a limited treatment history with Plaintiff and had only seen him on a monthly or bimonthly basis since the beginning of 2012 at the time of his May 2012 opinion. (*PageID##* 70, 681-763); *see* 20 C.F.R. §404.1527(c)(2)(i) (the longer and the more frequently a medical source has treated a claimant justifies placing more weight on that treating source's opinions).

      Plaintiff further contends that the ALJ erred by not considering Dr. Vitols's October 2011 finding that he could not carry on work-related activities on a sustained level. Yet, Dr. Vitols did not make this finding. Rather, based on the findings of his October 20, 2011 examination, Dr. Vitols found that Plaintiff was capable of doing the exertional demands of light work. (*PageID#* 636). Dr. Vitols also found that, because Plaintiff had lost significant cervical motion, he would have difficulty performing activities that required cervical motion with associated weakness of the left arm, and that this specific difficulty would adversely affect his ability to carry out work related activities on a sustained level.

13

(*PageID#* 636).  In other words, Plaintiff's cervical-motion loss adversely affected his ability to perform work activities requiring cervical motion on a sustained basis.  Thus, the ALJ correctly determined that these findings were not work preclusive, but instead were limitations as to the frequency and type of movements Plaintiff could perform with his neck, shoulders, and arms.  (*PageID#* 70).  The ALJ specifically noted that the limitations she incorporated into her assessment of Plaintiff's residual functional capacity dealt with the cervical conditions noted by Dr. Vitols, as well as other objective medical evidence.  (*PageID#* 70, n.3).  Specifically, the ALJ limited Plaintiff to "no repetitive rotation, flexion, or extension of the neck," and restricted him from more than occasionally pushing or pulling with his left arm and from more than frequent bilaterally side-reaching.  *Id*.  Plaintiff also could never reach bilaterally overhead or crawl.  *Id.*  Additionally, the ALJ also found that Plaintiff had additional nonexertional restrictions (PageID 65). The ALJ then posed to the vocational expert a hypothetical incorporating Plaintiff's residual functional capacity, which included these nonexertional limitations plus the ability to do sedentary work and the need to alternate between sitting and standing at will.  (*PageID##* 1116-20).  The vocational expert testified that there was work existing in significant numbers that such an individual with these limitations could perform.  *Id*.  In light of this, the ALJ reasonably found that the cervical limitations noted by Dr. Vitols were not work-preclusive.  (*PageID#* 70).

   Accordingly, Plaintiff's challenges to the ALJ's weighing of the medical source opinions lack merit.

B.     **Plaintiff's Remaining Contentions**

Plaintiff contends that the ALJ erred by failing to find that his severe impairments include "broken neck and bowel incontinence," as well as the muscle mass in his abdomen that he had for more than 12 months and that continued to limit him after it was surgically removed.

As set forth previously, *supra*, §IV, ALJ Withum found that Plaintiff has the severe impairments of degenerative disc disease in the lumbar spine and cervical spine, left shoulder arthritis, and depression.  These findings led the ALJ to continue her evaluation to the remaining steps of the required sequential evaluation.

Generally speaking, under Sixth Circuit case law, once an ALJ finds one or more severe impairments at step 2, "it is of little consequence" that the ALJ did not find other additional severe impairments. *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003); *see also Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (where the ALJ found that claimant had a severe impairment, "[t]he fact that some of [claimant's] impairments were not deemed to be severe at step two is [] legally irrelevant."); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (failure to find that an impairment was not severe was not reversible error because the ALJ found that claimant had other severe impairments).  This general rule applies in the present case because substantial evidence supports the ALJ's findings regarding Plaintiff's non-severe impairments and because ALJ Withum considered the combined effects of Plaintiff's severe and non-severe impairments at step 4 of her sequential evaluation when assessing

Plaintiff's residual functional capacity.

With regard to "shaken baby syndrome," which Plaintiff alleged was caused by his 2005 motor vehicle accident, there is little evidence showing that it qualified as a severe impairment. As the ALJ reasonably noted, the record is devoid of any such diagnosis or reference. (*PageID#* 62). Plaintiff argues that the ALJ's finding that this syndrome was not a medically determinable impairment "erodes the actual findings from the Drake Hospital that [Plaintiff] suffered from the late effects of a traumatic brain injury in 2005." (Doc. #10, *PageID#* 1116). Yet, Plaintiff appears to acknowledge that he was not diagnosed at that time with "shaken baby syndrome." Plaintiff nevertheless suggests that he experienced a severe brain injury. However, Plaintiff fails to point to any evidence of functional limitations caused by this brain injury. Significantly, a computer tomography (CT) scan in April 2005 failed to show any findings attributable to or associated with a head injury. (*PageID#* 428). Substantial evidence therefore supports the ALJ's residual functional capacity.

Contrary to Plaintiff's contention, the ALJ properly considered his broken neck and broken collarbone caused by the 2005 motor vehicle accident. (*PageID#* 62). However, the ALJ also noted that the record failed to show that Plaintiff underwent any further treatment for these conditions. (*PageID#* 62). Accordingly, Plaintiff's broken neck and collarbone did not persist for more than 12 months and, therefore, were not medically determinable impairments for purposes of deeming them "severe" at step two of the sequential evaluation. (*PageID#* 62); *see* 20 C.F.R. § 404.1520(a)(4)(ii). And, even

16

though the ALJ found this impairment to be non-severe, she considered it when assessing Plaintiff's residual functional capacity by taking into account his loss of cervical motion. (*PageID#* 65). Similarly, with regard to Plaintiff's bowel incontinence, the ALJ properly found that there was no evidence in the records of any diagnosis or treatment for this condition. (*PageID#* 62). While Plaintiff is correct that he was diagnosed with neurogenic bowel and bladder during his hospitalization following his 2005 motor vehicle accident, treatment notes reflect the result was constipation and not incontinence. (*PageID##* 372, 374). Significantly, post-admission examinations the following month in April 2005 failed to show a continued diagnosis or treatment for neurogenic bowel and bladder. *E.g. PageID#* 427. Dr. Allen's treatment notes do not confirm the presence of any incontinence, let alone significant ongoing incontinence, in 2012. *E.g., PageID##* 686, 773, 780, 959, 962.

  Plaintiff next argues that the ALJ erred in ignoring that Plaintiff had muscle removed from his abdomen. The ALJ, though, considered that Plaintiff underwent surgery to excise a flank mass and also pointed out that he had no further recurrence of muscular pain after this surgery. (*PageID#* 63). Substantial evidence supports this finding. Dr. Allen noted one week after Plaintiff's first surgery, that his abdomen was "somewhat sore from surgery" but was "recovering nicely." (*PageID#* 772). Dr. Allen further reported, "No further acute complaints were noted." *Id.* Plaintiff's large mass was surgically removed about 1 month later, in May 2012, and no evidence of malignancy was found. (*PageID#* 924). Although Plaintiff was experiencing abdominal pain in July 2012, he was

17

not experiencing "flank pain." (*PageID#* 959). His main reason for seeing Dr. Allen at that time was his pain shoulder. (*PageID##* 958-59). A follow-up visit to Dr. Allen in September reveals that Plaintiff was negative for abdominal pain and negative for flank pain. Again his main reason for this office visit was shoulder pain. (*PageID#* 962). The same was true in November 2012 when Plaintiff was negative for both abdominal and flank pain. (*PageID#* 965).

Arguing along another line, Plaintiff maintains that the ALJ's hypothetical questions to the vocational expert were based on her misunderstanding of the medical records and were incomplete by not including sitting or lying-down limitations. Plaintiff points out that the vocational expert clearly and unequivocally testified that if a claimant needed to lie down because of pain, he would not be able to perform unskilled sedentary work.

A proper hypothetical question posed to a vocational expert should accurately describe the claimant "in all significant, relevant respects; for a response to a hypothetical question to constitute substantial evidence, each element of the hypothetical must accurately describe the claimant." *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *see Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). "[T]he ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118 (6th Cir. 1994).

The hypothetical question posed to the vocational expert included all the limitation the ALJ included in her assessment of Plaintiff's residual functional capacity. Because

Plaintiff has not successfully challenged the ALJ's assessment of her residual functional capacity, there is no merit to his contentions that the ALJ should have included sitting and lying-down limitations in her hypotheticals. "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Because substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity, and because the hypothetical question to the vocational expert properly included those pertinent limitations, the ALJ properly relied on the vocational expert's testimony in finding that Plaintiff could perform a significant number of jobs in the regional and national economy. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777 (6th Cir. 1987) (an ALJ may rely on the vocational expert's testimony in response to a hypothetical question if the question accurately portrays a claimant's impairments).

Accordingly, Plaintiff's remaining challenges to the ALJ's decision lack merit.

**IT IS THEREFORE RECOMMENDED THAT:**

1. The Commissioner's non-disability decision dated March 25, 2013 be affirmed; and

2. The case be terminated on the Court's docket.


July 15, 2015

                s/Sharon L. Ovington
                 Sharon L. Ovington
              Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).